UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GATX CORPORATION, a New York Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 16 C 340 |
| ASSOCIATED ENGERY SERVICES, LP, a Texas limited partnership, and, SPARK ENERGY VENTURES, LLC, a Texas limited liability company, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

CHARLES P. KOCORAS, District Judge:

Plaintiff GATX Corporation filed this two-count diversity action against Defendants Associated Energy Services LP ("AES") and Spark Energy Ventures, LLC ("Spark") on January 11, 2016. GATX alleges breach of a railcar "Car Service Contract" against AES (Count I) and breach of a related Guaranty against Spark (Count II). *See* Dkt. 1. Defendants filed their Answer, Affirmative Defenses, and Counterclaim [12] on March 28, 2016. Now before the Court are: (1) GATX's "Motion to Dismiss Defendants' Counterclaim, or in the Alternative, for Judgment on the Pleadings, and to Dismiss or Strike Defendants' Affirmative Defenses," and (2) GATX's "Motion for Partial Judgment on the Pleadings" [15]. For the reasons below, the first motion [14] is granted as to Defendants' Third Affirmative Defense, and otherwise denied; and the second motion [15] is denied in its entirety.

## BACKGROUND

As required by Federal Rules of Civil Procedure 12(b)(6) and 12(c), the Court assumes the following allegations in Defendants' Counterclaim to be true.[1] Between August and December 2013, AES and GATX entered into a "Car Service Contract" (the "Lease") and two "Riders" to that agreement. Dkt. 12, at 14, ¶¶ 2-3. "The sole and exclusive purpose of the Lease and Riders No. 1 and 2 was for AES to lease Department of Transportation Specification 111 ('DOT-111') railcars to carry crude petroleum oil," *id*. at ¶ 4; and, consistent with that purpose, Riders No. 1 and 2 stated "that the leased Cars 'may only be used to carry' crude petroleum oil," and thus "affirmatively precluded AES from using the railcars for any other purpose." *Id*. So, Defendants allege, "the parties understood and agreed that the Lease would not be of any value, and could not be performed, unless the DOT-111 Cars were used to carry crude petroleum oil." *Id*. at ¶ 5. According to their Counterclaim, however, "numerous unforeseeable regulatory and industry events" in 2014 and 2015 "significantly affected the above-referenced implied condition of the Lease and otherwise effectively destroyed the fundamental purpose for the leased Cars." *Id*. at ¶ 6.

For a start, Defendants allege that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") published new rules in May 2015 that require "all DOT-111 railcars used to ship certain high-hazard materials (such as crude petroleum oil) to be replaced and/or substantially retrofitted within approximately three years, or on or

---

[1] *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016) (dismissal under Fed. R. Civ. P. 12(b)(6) and 12(c) requires "accepting the well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs").

before January 1, 2018." *Id*. at ¶ 8. As a result, "DOT-111 railcars in their current form will generally not be authorized after that date for use in shipping highly flammable liquids such as crude petroleum oil." *Id*. Canadian rail authorities also allegedly imposed new regulations that "generally prevent the use of DOT-111 railcars (in their current form) after May 1, 2017," and "placed an embargo on certain DOT-111 railcars built prior to 2011 (such as the Cars at issue in the Lease)." *Id*. at ¶ 10. Also during this timeframe, in response to several railcar accidents involving shipments of flammable liquids, "several federal agencies issued emergency orders or recommendations relating to new safety-related standards for railcars (including DOT-111 railcars) carrying flammable liquids such as crude petroleum oil." *Id*. at ¶ 11. And in apparent response to these regulatory actions, Canadian and U.S. railroads began "imposing surcharges or favored discounts (ranging from $325 to approximately $1,200 per car) relating to the use of any DOT-111 railcar." *Id*. at ¶ 12.

According to Defendants' Counterclaim, "AES did not know, nor could AES/GATX have reasonably foreseen" (1) "that multiple railcar accidents involving the shipment of flammable liquids would occur, and that the United States and Canadian authorities would choose to further regulate DOT-111 railcars at least in part as a result of those accidents," (2) "that United States and Canadian authorities would respond to their increasing safety concerns by phasing out the DOT-111 railcars, such that DOT-111 can no longer be legally manufactured effective October 1, 2016," or (3) "that as an apparent result of the above, third-parties would impose substantial surcharges on the use of the very Cars subject to the Lease." *Id*. at ¶ 13.

Defendants also allege that these regulatory changes and private railroad surcharges "have materially destroyed AES's performance under the Lease," "essentially wiped out the entire purpose of the Lease," and "changed the essential nature of AES's performance under the Lease because it will require AES to operate under the Lease with what are now effectively 'rolling dead' railcars, and at a material financial loss." *Id*. at ¶ 14. Defendants say that "AES's losses will be so severe and unreasonable that the failure to excuse AES's performance under the Lease would result in grave injustice." *Id*. at ¶ 15. Defendants therefore seek rescission, to place the parties "in the status quo that existed prior to execution of the Lease." *Id*. at ¶¶ 16-17.

GATX filed this case in January 2016, alleging breach of the Lease by AES and breach of a related Guaranty by Spark. *See* Dkt. 1. According to GATX, "AES requested an early termination of the Lease" in "various communications" around September 2015, and "GATX refused AES's request for early termination" and "informed AES that the Lease does not contain an early termination provision, and that the Cars shall remain on lease until the applicable expiration date of the riders." Dkt. 1, at ¶¶ 30-33. GATX further alleges that, "AES stopped paying rent on the Cars in August 2015," *id*. at ¶ 38; "began sending the Cars to GATX's facility . . . in an attempt to terminate the Lease without GATX's consent," *id*. at ¶ 34; and "failed to clean the Cars of commodities as required." *Id*. at ¶ 39. Thus, according to GATX, "AES has breached the Lease by failing to pay rent, terminating the Lease before its expiration, and failing to clean the Cars as required," i*d*. at ¶ 41; and Spark has breached its Guaranty of AES's "liabilities and obligations." *Id*. at ¶¶ 52-53.

In their Answer to GATX's Complaint, Defendants asserted several affirmative defenses, including one alleging "the doctrines of commercial frustration and/or impossibility and/or impracticability in that, among other things, the Cars at issue have been the subject of substantial intervening regulatory and industry changes which were not reasonably foreseeable and which have resulted in the total or near total destruction of the value of AES's performance under the Lease." Dkt. 12, at 13. Defendants' Counterclaim, in turn, incorporates these defenses and seeks rescission of the Lease based on the same facts. *Id*. at 14-18. GATX now moves pursuant to Rules 12(b)(6), 12(c), and 12(f) to strike Defendants' Affirmative Defenses, dismiss their Counterclaim, and for judgment on the pleadings in GATX's favor. Dkts. 14-15.

**DISCUSSION**

The standards for dismissal under Rule 12(b)(6) and for judgment on the pleadings under Rule 12(c) are straightforward; a claim may be dismissed, or judgment on the pleadings granted, if the claim fails to state "a claim that is plausible on its face," meaning that the claim needs "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *St. John*, 822 F.3d at 389 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Similarly, affirmative defenses may be struck under Rule 12(f) "only when they are insufficient on the face of the pleadings." *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (quotation omitted). As explained below, except for the challenge to Defendants' Third Affirmative Defense (denying GATX's right to consequential damages), GATX's motions fail to meet these standards.

## I. Motion to Strike Defendants' Affirmative Defenses

The Court turns first to GATX's request to strike Defendants' Affirmative Defenses, since Defendants' Counterclaim rests largely (if not entirely) on their First Affirmative Defense of "commercial frustration and/or impossibility and/or impracticability." GATX correctly contends that, under Illinois law,[2] such a defense "is 'not to be applied liberally' and is only appropriate if a 'rigorous' two-part test is satisfied." Dkt. 20, at 4 (quoting *Blue Cross Blue Shield of Tenn. v. BCS Ins. Co.*, 517 F. Supp. 2d 1050, 1059-60 (N.D. Ill. 2007)). Specifically, "a party must demonstrate that: '(1) the frustrating event was not reasonably foreseeable; and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event.'" *Id*. GATX is also correct that "the foreseeability of the frustrating circumstance and the ability of defendant to overcome it are questions of law to be resolved by the court." *Id.* (citing *Bartlett Commons Shopping Ctr. v. Schultz Sav-O-Stores, Inc.*, No. 92 C 2787, 1992 WL 345052, at *1 (quoting *Northern Ill. Gas Co. v. Energy Coop.*, 122 Ill. App. 3d 940, 952, 461 N.E.2d 1049, 1059 (3d Dist. 1984)). But GATX is incorrect in asserting that those issues may be resolved at the pleadings stage in the present case. *See Scottsdale Ltd. P'ship v. Plitt Theatres, Inc.*, 97 C 8484, 1999 WL 281085, at *4 (N.D. Ill. Mar. 31, 1999) (denying motion to strike where plaintiff "sufficiently alleged both elements of commercial frustration").

---

[2] The parties agree that the Lease "is governed by Illinois law," Dkt. 12, ¶ 12, and uniformly refer to Illinois law in their briefs; so the Court looks to Illinois law, as well. *See Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) (following Illinois choice-of-law rules to apply law selected in contractual choice-of-law provision).

As to the foreseeability prong, GATX argues that "new regulations were not unforeseeable as a matter of law," because the Lease demonstrates on its face that "the parties explicitly foresaw them." Dkt. 20, at 5. To support that contention, GATX points to Paragraph 6 of the Lease, which "sets forth the agreed upon procedure if physical alterations or modifications to the Cars are 'required by the AAR or any government, agency, group or committee exercising authority over rail car design or operation.'" *Id.* (quoting Dkt. 14-1, ¶ 6(b)). But Defendants counter that Paragraph 6 merely "purports to give GATX the authority to terminate the Lease, or substitute Cars within 60 days, if new regulations require modifications that GATX deems uneconomical" Dkt. 18, at 8; it does not address "the effect of new regulations on AES's (as opposed to GATX's) rights," or substantial surcharges or regulations that require "the phasing out of the Cars in their current form." *Id.* at 9. Thus, while Paragraph 6 of the Lease does foreshadow the possibility of regulatory developments requiring modifications to individual cars, and this provision will certainly bear on the foreseeability of the regulatory sea change that Defendants allege, the Court agrees that this Paragraph alone does not dispose of that question at the pleadings stage.

The same is true of the second "impossibility" prong. GATX argues that "AES's continued performance was (and continues to be) possible" under the options provided by Paragraph 6—*i.e.*, "to allow GATX to elect" to "(i) terminate the Lease if modifications were uneconomical, (ii) substitute the Cars, or (iii) modify the Cars and charge AES for the cost." Dkt. 21, at 5. But this is all disputed, since AES contends (and alleges) not merely that the Cars require modification or substitution, but rather,

"the phasing out of the Cars in their current form," Dkt. 18, at 9; Dkt. 12, Counterclaim, ¶¶ 7, 13, "which effectively destroyed the fundamental purpose for the leased Cars." Dkt. 12, Counterclaim, ¶ 6, ¶ 14 ("regulatory changes surrounding DOT-111 rail cars, and the third-party surcharges, have material destroyed AES's performance under the Lease"); Dkt. 18, at 3-4, 10 (same). Such an allegation that a party "will be unable to conduct its intended business at all" is sufficient to allege the impossibility prong of commercial frustration under Illinois law. *Scottsdale*, 1999 WL 281085, at *4.[3] Thus, while GATX is free to argue that the regulatory changes at issue here were foreseeable and that performance remains possible (which GATX is also free to prove by striking a deal for performance with AES or another taker), the Court is required to give Defendants the benefit of that doubt at this early stage. GATX's request to strike Defendants' First Affirmative Defense is therefore denied.

GATX's motion to strike is also denied as to Defendants' Second, Fourth, and Fifth Affirmative Defenses (for waiver and/or estoppel, termination of the Lease, and mitigation of damages, respectively). As noted above, such defenses will be stricken "only when they are insufficient on the face of the pleadings." *Williams*, 944 F.2d at 1400. Moreover, motions to strike "are 'not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which

---

[3] GATX's chief authority—*Springfield Oil Drilling Corp. v. Weiss*, No. 02 C 249, 2003 WL 22025006 (N.D. Ill. Aug. 28, 2003)—is inapposite for the same reasons. Unlike the present case, *Springfield* was decided on summary judgment (not the pleadings) and involved a single tax law change much more clearly identified in the instruments at issue, after which the defendant still "received considerable benefits from" the challenged agreement. *Id*. at *6-7.

could be proved in support of the defense.'" *Id.* (quoting *Glenside West Corp. v. Exxon Co.*, 761 F. Supp. 1100, 1115 (D.N.J. 1991)). And even if *Iqbal's* plausibility standard applies to affirmative defenses pled under Rule 8(c)—which the Seventh Circuit has yet to decide—the Court finds these defenses sufficiently pled. *See NewNet Comm. Techs., LLC v. VI E-Cell Tropical Telecom, Ltd.*, 85 F. Supp. 3d 988, 1000 and n. 11 (N.D. Ill. 2015). Each is properly pled as such,[4] none is insufficient on its face, and Defendants have set forth plausible factual bases in each case. That is not to say that GATX's arguments against the applicability of these defenses (Dkts. 14, 20) are incorrect or unpersuasive, only that those arguments go the merits rather than whether the defenses are adequately pled, which is the pertinent inquiry at this stage.

The same is not true, however, of Defendants' Third Affirmative Defense, which asserts that "the Lease precludes Plaintiff from recovering any consequential damages." Dkt. 12, at 13. As GATX correctly argues, "that is not an affirmative defense, merely a denial of GATX's claim." Dkt. 14, at 10; *see also Bell v. Taylor*, -- F.3d --, 2016 WL 3568139, at *3 (7th Cir. July 1, 2016) (an affirmative defense "limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case" (quoting *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 n.9 (7th Cir. 2005)). GATX's motion to strike this defense is therefore granted.

---

[4] *See Maurice Sporting Goods, Inc. v. BB Holdings, Inc.*, 15-cv-11652, 2016 WL 2733285, at *3 (N.D. Ill. May 11, 2016) ("Failure to mitigate damages is an affirmative defense under Illinois law." (brackets omitted)); *NewNet*, 85 F. Supp. 3d at 1000 ("termination" affirmative defense sufficiently pled); *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 773 (N.D. Ill. 2005) (termination "fits the classic template of affirmative defense" because it admits the "basic factual allegation" of liability) (citing Wright & Miller); Fed. R. Civ. P. 8(c) (listing waiver and estoppel).

## II. Motion to Dismiss Defendants' Counterclaim

In addition to its challenge of Defendants' commercial frustration defense, GATX also seeks dismissal of Defendants' Counterclaim as "duplicative of their affirmative defense of commercial frustration." Dkt. 20, at 1. But while Defendants' Counterclaim certainly relies upon that theory as a defense to GATX's claims (Dkt. 12, at 13), the Counterclaim goes further by affirmatively seeking rescission of the Lease to restore "the status quo that existed prior to the execution of the Lease." *Id.* at 18, ¶¶ 17-18. Because impossibility of performance is "a ground for rescission," and Defendants' Counterclaim affirmatively seeks rescission on that basis, Defendants' Counterclaim is not duplicative of their First Affirmative Defense. *See Downs v. Rosenthal Collins Grp, L.L.C.*, 2011 IL App (1st) 090970, ¶ 39, 963 N.E.2d 282, 294 (2011) ("Impossibility of performance, as a ground for rescission of a contract, refers to those factual situations where one party to a contract finds that the purpose for which a contract was made has become impossible to perform on one side." (quoting 30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77.95, at 593 (4th ed. 2004)).

GATX also argues that "Paragraph 6 of the Lease unambiguously precludes Defendants' Counterclaim," because "Paragraph 6(a) gives GATX – not AES – the option to terminate the Lease if GATX determines that it is uneconomical to modify or substitute the Cars," Dkt. 14, at 5; "Paragraph 6(b) goes on to state that if the Cars require modification, GATX may, 'at its option,' perform such modifications and charge AES for them," *id*; and Paragraph 6(c) "provides that AES' monthly services

charges shall not abate while such modifications are being performed." *Id*. Thus, GATX argues, "GATX alone has the option to terminate the Lease, retrofit the Cars, or substitute them," and "AES assumed the economic risk of new regulations during the term of the Lease by agreeing to be responsible for such costs." *Id*. According to GATX, "these unambiguous terms must be enforced as written." *Id*.

But GATX's termination right in Paragraph 6(a) of the Lease does not speak to the situation alleged here. That Paragraph states: "If ***any car*** is in need of inspection, maintenance, modification or alteration determined by GATX to be uneconomical to perform or if ***any car*** is determined by a railroad to have been destroyed, GATX has the option ***to terminate this Agreement with respect to such car*** effective upon notification by GATX to Customer or to substitute another car of approximately the same age, type and capacity under this Agreement within a period of time not to exceed sixty (60) days." Dkt. 14-1, ¶ 6(a) (emphasis added). The Lease thus gives GATX the right to terminate the agreement with respect to ***any car*** whose "inspection, maintenance, modification or alteration" is "determined by GATX to be uneconomical to perform." It does not address Defendants' allegation that all 33 cars covered by the Lease may no longer be used for the undisputed purpose for which they were leased. *See* Dkt. 12, ¶ 11 (admitting GATX's allegation that "AES leased 33 railcars for the purpose of transporting crude petroleum oil"); *id*. at Counterclaim, ¶ 4 ("Riders No. 1 and 2 affirmatively precluded AES from using the railcars for any other purpose."), ¶ 6 ("unforeseeable regulatory and industry events . . . effectively destroyed the fundamental purpose for the leased Cars: hauling crude petroleum oil").

Moreover, to the extent Paragraph 6(a) gives GATX "alone" the right to terminate the Lease when (accepting Defendants' allegations as true) all 33 cars have been rendered unusable by an unforeseeable event, that would in turn raise issues under Illinois law that the Court could not resolve at the pleadings stage. *See*, *e.g.*, *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 681 (7th Cir. 2013) ("The duty of good faith and fair dealing is particularly important where one party reserved a discretionary right to modify or terminate the contract in a way that would give that party the opportunity to take unfair advantage of the other. . . . Even if [one party] had such a reserved power, . . . it had a duty to exercise that power in good faith, and the district court erred by dismissing this claim on the pleadings.") (citing *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000) (citing Illinois cases)); *Schwinder v. Austin Bank of Chi.*, 348 Ill. App. 3d 461, 473, 809 N.E.2d 180, 193 (1st Dist. 2004) ("Such a mutuality of obligation issue arises when there is one party to a contract that has an unfettered right to terminate the contract." (citing Illinois cases)).

Accordingly, the Court concludes that Paragraph 6 of the Lease does not preclude Defendants' impossibility defense at the pleadings stage, and therefore does not preclude Defendants' Counterclaim for rescission based on the same theory. GATX's motion to dismiss the Counterclaim as "unambiguously" precluded by the parties' Lease (Dkt. 14, at 5) is therefore denied. But again, the Court expresses no view on the strength of Defendants' impossibility defense; it holds only that (accepting Defendants' allegations as true) the defense is adequately pled.

### III. Motion for Judgment on the Pleadings

The above discussion largely disposes of GATX's Motion for Partial Judgment on the Pleadings [15], though two issues remain. GATX claims it is entitled to judgment on the pleadings on the "limited issue" of whether "AES breached the Lease when it stopped paying rent and tried to return the Cars to GATX." Dkt. 21, at 2. According to GATX, "AEX's liability for breaching the Lease is undeniable," because it "admits that it stopped paying for the Cars and sent them back to GATX." Dkt. 15, at 6. And GATX argues that Defendants' impossibility defense is no help here, because AES returned the Cars and stopped paying rent "20 months before the first regulations are scheduled to take effect in 2017," and thus, "AES's performance was not impossible at the time it breached the lease." Dkt. 20 at 5-6. Assuming such a breach, GATX then asks for "judgment on the pleadings that Spark is liable for the full payment and performance of AES' obligations under the Lease." Dkt. 15, at 7.

There are two problems with these arguments. First, as noted above, Defendants' Counterclaim seeks rescission of the Lease based on the impossibility of their performance. "Rescission of a contract refers to cancellation of that contract, so as to restore the parties to the *status quo ante*, the status before they entered into the contract." *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 353, 944 N.E.2d 895, 917-18 (1st Dist. 2011). Although Defendants' impossibility claim might not succeed on the merits, the Court is obliged to give Defendants the benefit of that doubt at this early stage and assume that the Lease will be rescinded, thereby restoring the parties to their pre-contractual positions before any breach occurred.

Second, even if the Court could assume that Defendants' performance were (and is) possible and that the Lease will remain intact, as also noted above, Defendants have asserted additional affirmative defenses of waiver and/or estoppel and termination. *See* Dkt. 12, at 13 (Second and Fourth Affirmative Defenses). Again, while the Court expresses no view regarding the strength of these defenses, it is nevertheless obliged at this stage of the proceedings to assume their viability, and that GATX's claims "are barred, in whole or in part" by these defenses, as Defendants allege. *Id*. Accordingly, with these defenses currently remaining in the case, GATX is not entitled to judgment on the pleadings as to either AES's breach of the Lease or Spark's failure to satisfy AES's obligations under the Lease.

## CONCLUSION

For the foregoing reasons, Plaintiff GATX Corporation's Motion to Dismiss Defendants' Counterclaim, or in the Alternative, for Judgment on the Pleadings, and to Dismiss or Strike Defendants' Affirmative Defenses [14] is granted as to Defendants' Third Affirmative Defense, which is hereby stricken, and otherwise denied; GATX's Motion for Partial Judgment on the Pleadings [15] is denied; GATX is allowed until September 7, 2016, to answer the Defendants' Counterclaim [12]; and this matter is set for status on September 13, 2016, at 9:30 a.m.

Dated: August 17, 2016

Charles P. Kocoras
United States District Judge